**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN CANTU and JOHN DOWNES, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 1:15-cv-09240** |
| **v.** | ) ) | |
| **BRINK'S INCORPORATED,** | ) ) | **Judge Samuel Der-Yeghiayan** |
| **Defendant.** | ) ) | |

**REPLY IN SUPPORT OF**
**MOTION TO STRIKE CLASS ALLEGATIONS, TO DISMISS THE COMPLAINT**
**OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**Introduction**

Plaintiffs John Cantu ("Cantu") and John Downes ("Downes") have conceded the following elements of the Motor Carrier Act exemption: (1) that Defendant Brink's Incorporated ("Brink's") is an authorized "motor carrier" under USDOT #76054, (2) that the armored vehicles weighed in excess of 10,000 pounds, and (3) that Cantu was a "Driver" who performed duties directly affecting the vehicle's safe operation. By their admissions, Plaintiffs also concede another element of the Motor Carrier Act exemption – that they transported property in interstate commerce by crossing Illinois-Indiana state lines for deliveries and pickups in Indiana, by picking up checks deposited at automated teller machines ("ATMs") and/or by picking up air freight packages at O'Hare International Airport that were flown in internationally or from out-of-state.

Although courts have applied the Motor Carrier Act exemption to plaintiffs who never even crossed state lines, as Plaintiffs admittedly did, they attempt to argue that the exemption should not apply to them because their interstate commerce work was allegedly *de minimis.*

Plaintiffs are legally and factually wrong. The Supreme Court has rejected the *de minimis* challenge to jurisdiction and held that employees are subject to the Motor Carrier Act exemption when they could reasonably have been expected to, or actually did, engage in interstate commerce. *See Morris v. McComb*, 332 U.S. 422, 433-34 (1947). Plaintiffs' transportation of property in interstate commerce plainly shows that they actually did engage in interstate commerce and that there was a reasonable expectation that they could do so.

By their admissions, Plaintiffs have conceded application of the Motor Carrier Act exemption as to John Cantu. They have also effectively conceded application of the Motor Carrier Act exemption as to John Downes but for one element – whether he performed duties directly affecting the vehicle's safe operation. Plaintiffs, however, admit that Messengers such as Downes load the armored vehicles. The Secretary of Transportation ("Secretary") has determined that "assist[ing] in loading the vehicles" is a duty of a "Driver's Helper" that directly affects the vehicle's safe operation. 29 CFR §782.4(a). The Secretary has also determined that "Driver's Helpers" include "armed guards on armored trucks" such as Downes. *Id.* Messengers such as Downes are also in charge of the armored vehicle crew during their runs. They are responsible for complying with all safety rules and regulations and for ensuring that the Driver performs his or her duties with particular regard to safety and security, including driving safely.

Because all the elements of the Motor Carrier Act exemption are met, Brink's respectfully requests that summary judgment be granted for Defendant and against Plaintiffs.

### A.   Plaintiffs' admissions confirm that they actually did engage in interstate commerce and that there was a reasonable expectation that they could do so.

Plaintiffs concede that they actually crossed state lines and engaged in work that constitutes transportation in interstate commerce. They contend, however, that the Motor Carrier Act exemption should not apply to them because their interstate work was allegedly *de minimis.*

The Supreme Court has rejected this *de minimis* challenge to jurisdiction and held that when employees are transporting, or could be called upon to transport, a shipment in interstate commerce in the regular course of employment, they are subject to the Secretary's jurisdiction under the Motor Carrier Act. *See Morris v. McComb*, 332 U.S. 422, 433-34 (1947).

The *Morris* Court held that even an employee's minor involvement in interstate commerce will suffice, although most of his transportation is intrastate. It found that every driver was subject to the Secretary's jurisdiction, even two who had not driven at all in interstate commerce, given the probability that they would be assigned to interstate runs. 332 U.S. at 433-34; *see* 29 CFR §782.2(c)(1); *see also Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895, 901 (7th Cir. 2009) ("to divide jurisdiction" over the same employees between the Motor Carrier Act and the Fair Labor Standards Act "would be contrary to the Supreme Court's sensible decision in *Morris v. McComb* . . . which held that the employer of a driver who may sometimes be required to deliver goods in interstate commerce is subject to the Motor Carrier Act even if most of his driving is intrastate").

The *Morris* Court further confirmed the Secretary's power to establish the requirements for employees to be exempt under the Motor Carrier Act exemption. 332 U.S. at 434. Jurisdiction does not attach if there is no possibility that the employee would engage in interstate commerce or the possibility is remote. *Goldberg v. Faber Industries*, 291 F.2d 232 (7th Cir. 1961) (drivers were not subject to the Motor Carrier Act exemption because they had never been used in interstate commerce and could not reasonably be expected to handle an interstate run in the normal performance of their duties).

Applying this analysis, Plaintiffs' admissions confirm that they did, in fact, engage in interstate commerce in the regular course of their employment and that there was a reasonable

expectation that they could do so.  Accordingly, this element of the Motor Carrier Act exemption is met.  The court need go no further in its analysis.

Should the court wish to consider the Federal Highway Administration's ("FHWA") "notice of interpretation" on this issue, the FHWA expresses a preference for 4-month jurisdictional periods:  "Evidence of driving in interstate commerce or being subject to being used in interstate commerce should be accepted as proof that the driver is subject to 49 U.S.C. 304 for a 4-month period from the date of the proof."  *See* 46 FR 37902-02.  The FHWA believes a 4-month jurisdictional period is reasonable because it avoids two extremes – the too strict week-by-week approach and the situation where an employee could be used once on an interstate run (or be subject to being used once) and remain exempt for an unlimited time.  *See* 46 FR 37902-02.

### 1.     The regularity (and number of ways) with which Downes transported shipments in interstate commerce conclusively demonstrates that he was subject to the Motor Carrier Act exemption.

A prior court has determined that Brink's business is interstate and global.  Thus, there is no dispute that Brink's engages in interstate and foreign commerce.  *See Hernandez v. Brink's, Inc.*, 2009 WL 113406 (S.D. Fla. 2009).  Accordingly, Downes was subject to being used in interstate commerce from the date of his hire.

Downes has further admitted to more than enough interstate activity to meet the FHWA's 4-month guidance.  He concedes that during his 9-month employment with Brink's, he crossed state lines into Indiana "5 times" to pick up and deliver Liability.[1]  (Downes Decl. ¶7); (McVoy Supp. Decl. ¶9).  *See* 29 CFR §782.7(b)(1) ("Highway transportation by motor vehicle from one

---

[1] "Liability" is Brink's customers' property such as coin, currency, negotiable instruments, jewelry and other valuables.  (*See* Local Rule 56.1(a)(3) Statement of Material Facts to Which There is No Genuine Dispute, ¶6).

State to another, in the course of which the vehicles cross the State line, clearly constitutes interstate commerce").

Downes also admits that his "primary job duties" included emptying and re-loading "Customer A's"[2] ATMs. (Downes Decl. ¶3). On at least 82 days throughout his short employment, he had Customer A's ATMs on his routes and was responsible for picking up checks deposited at the ATMs. (McVoy Supp. Decl. ¶¶2, 4).[3] When emptying Customer A's ATMs, he took the deposited checks and placed them in a check bag, which he delivered to the Chicago Branch vault. (Downes Decl. ¶7). At Customer A's standing direction, Brink's packages these unaltered checks daily and ships them across state lines via UPS to a facility in Louisville, Kentucky. (McVoy Supp. Decl. ¶5); *see also* (McVoy Dec. ¶17). Thus, the checks do not come to a rest in Brink's vault but form a "practical continuity of movement" across state lines from the point of origin (Customer A's Chicago ATMs) to the point of destination (Louisville, Kentucky). *See* 29 CFR §782.7(b)(1) ([t]ransportation within a single State is in interstate commerce … where it forms a part of a 'practical continuity of movement' across State lines from the point of origin to the point of destination"; "the fact that other carriers transport it out of or into the State is not material").

On another 9 days during his short employment, Downes picked up checks from Customer B's stores in Indiana and/or Illinois, which he delivered to the Chicago Branch vault. (McVoy Supp. Decl. ¶6). At Customer B's standing direction, Brink's packages these unaltered

---

[2] Due to safety and security concerns, Brink's is substituting "Customer A" and "Customer B" for the actual client names.

[3] Brink's route guides contain customer information which, if made public, could compromise safety and security. Accordingly, they cannot be attached and filed with Ryan McVoy's Supplemental Declaration. If Plaintiffs or the Court wish to review the referenced route guides, Brink's will provide them pursuant to an appropriate Protective Order to be entered by this Court. The robust number of days in which Plaintiffs engaged in interstate commerce, as reflected in Mr. McVoy's Supplemental Declaration, is based on an initial review of Brink's route guides. The numbers will only increase with further review.

checks daily and ships them across state lines to a check-processing company in Minneapolis, Minnesota.  (McVoy Supp. Decl. ¶8); (McVoy Decl. ¶¶17-18).[4]  Thus, the checks from Customer B also do not come to a rest in Brink's vault and, instead, form a "practical continuity of movement" across state lines from the point of origin (Customer B's stores in Chicago or Indiana) to the check-processing company in Minneapolis where the payees' accounts are credited and the checks returned to the out-of-state banks on which they were drawn by the payor.  The fact that some checks cross state lines two or three times – from Customer B's stores in Indiana to the Chicago Branch to the check processing center in Minnesota to the payor bank's state(s) – further highlights their multi-state journey in interstate commerce.

On at least two days during his short employment, Downes picked up Brink's Global Services ("BGS") packages from Brink's clients.  BGS packages, by their nature, are designated for delivery in another state or country.  (McVoy Supp. Decl. ¶11).

      **2.**      **The regularity (and number of ways) with which Cantu transported shipments in interstate commerce conclusively demonstrates that he was subject to the Motor Carrier Act exemption.**

Likewise, Cantu has admitted to more than enough interstate commerce to meet the 4-month guidance.  He admitted that "ten times" he picked up air freight packages at O'Hare International Airport flown in via air and that he too serviced ATMs, like Mr. Downes.  (Cantu Decl. ¶¶ 4, 7).  On at least two days during the relevant period, Cantu picked up BGS packages from Brink's clients that were designated for delivery in another state or country.  (McVoy Supp. Decl. ¶11).

Cantu admitted to "occasionally" driving across state lines into Indiana to deliver and pickup Liability.  (Cantu Decl. ¶10).  Brink's found at least 8 days during the relevant period

---

[4] The transported checks are processed by the check-processing company, the payees' accounts are credited and the checks returned to the out-of-state banks on which they were drawn by the payor. (McVoy Decl. ¶17).

6

when he drove across state lines to pick-up and deliver Liability in Indiana. (McVoy Supp. Decl., ¶10).

On at least 20 days during the relevant period, Cantu had Customer B stores in Illinois or Indiana on his routes and was responsible for picking up checks from these stores. (McVoy Supp. Decl. ¶7). On another 7 days during the relevant period, he had Customer A's ATMs on his routes and was responsible for picking up checks deposited at these ATMs. (*Id*. ¶¶3, 4).

After Cantu or his crew returned the checks to the Chicago Branch vault, Brink's immediately shipped the unaltered checks (per the clients' standing orders) across state lines to their respective out-of-state destinations. (*Id*. at ¶¶5, 8). Thus, the checks did not come to a rest in Brink's vault but again formed a "practical continuity of movement" across state lines from the point of origin (Customer A's Chicago ATMs and Customer B's Illinois and Indiana stores) to the point of destination (Kentucky for Customer A) (Minnesota for Customer B, then to the payor banks in yet additional states).

The analysis in *Collins* confirms that the intrastate leg of the shipment was part of an interstate shipment where, as here, the checks underwent no alteration during their journey and the applicable bank and retailer intended the shipment to continue to an out-of-state location at the time the checks were picked up at their respective ATMs and retail stores. It is irrelevant to the analysis that *Collins* involved the transportation in interstate commerce of a consumer good versus a negotiable instrument. *See Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895, 899-901 (7th Cir. 2009) (summary judgment affirmed for employer where intrastate leg of shipment was deemed part of an interstate shipment because the shipper had a "fixed and persisting transportation intent beyond the terminal storage point at the time of shipment" and the shipment "undergoes no alteration during its journey"; "the journey is subject to the Motor Carrier Act" up

7

until the point where "the good may be said to 'come to rest' – to have ceased to be 'in practical continuity with a larger interstate journey'").

As this evidence shows, Plaintiffs' work in interstate commerce was far from *de minimis*. There is no genuine issue of material fact that Plaintiffs did, in fact, transport property in interstate commerce in the regular course of their employment. The interstate commerce element of the Motor Carrier Act exemption is plainly met.

**B.   Downes admits he loaded the armored trucks and, thus, was a "Driver's Helper" who performed a duty directly affecting the vehicle's safe operation.**

Plaintiffs attempt to defeat summary judgment by contending that Downes performed no duties directly affecting the safe operation of Brink's armored vehicles. (*See* Plaintiffs' Response, p. 7). Downes, however, has admitted to loading Brink's armored vehicles, which is a duty that directly affects the vehicle's safe operation. *See* 29 CFR §782.4(a) (Driver's Helpers include "armed guards on armored trucks" who are "required to ride on a motor vehicle"; they "directly affect the safety of operation" when they "assist in loading the vehicles"). (*See also* Cantu Decl. ¶3; Plaintiff's Rule 56.1 Counterstatement of Undisputed Facts ¶2).

Plaintiffs argue that "simply being a loader does not make you responsible for truck safety." (*See* Plaintiffs' Response, p. 7). When Downes signed his Brink's employment application, he agreed to "abide by all the rules and regulations of Brink's including all applicable safety rules." (McVoy Supp. Decl. ¶12, authenticating Downes' application). His argument ignores Brink's evidence in its opening brief that Messengers "must comply with detailed rules, regulations and procedures established by Brink's pursuant to the USDOT's Federal Motor Carrier Safety Regulations ('FMCSR')." "Messengers such as Mr. Downes must load and unload armored vehicles in accordance with the FMCSA's safety standards." (McVoy Decl. ¶¶7, 10).

Messengers such as Downes are taught to load with regard to both safety and security. (McVoy Supp. Decl. ¶13). They load and secure Liability in the vehicle's compartments to prevent it from becoming a dangerous projectile, should there be an abrupt stop or accident. (*Id.*) When Liability does not fit in the vehicle's compartments, it is secured in large buckets or bins that are not stacked – but positioned on the truck's floor low to the ground – so they cannot injure the Messenger by falling or becoming airborne. (*Id.*) A package that cannot be placed in a compartment, bucket or bin must be carefully positioned on the floor to not create a slip/trip and fall hazard. (*Id.*) Coin shipments are particularly heavy and can readily weigh 2000 or more pounds. (*Id.*) A box of quarters weighs 25 pounds, nickels (23 pounds), dimes (12 pounds) and pennies (15 pounds). (*Id.*) Coin shipments are wrapped and positioned on the floor to prevent coin from becoming a heavy projectile and to ensure the truck remains balanced. (*Id.*)

Plaintiffs argue that loading only affects safety when it "has an effect on the truck's ability to maneuver while driving." (Response, pp. 7-8). The regulation's definition of a loader, however, is not so limited. 29 CFR §782.5(a). Section 782.5(a) applies not only to "building a balanced load" but also to "placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized." Plaintiffs' argument ignores the second portion of Section 782.5(a)'s standard, which Brink's has plainly met.

In addition, Plaintiffs do not dispute that Drivers perform duties such as driving that directly affect the vehicle's operation. Messengers are in charge of the entire crew during their runs, which includes responsibility for ensuring that the Driver performs his or her duties with particular regard to safety and security, including driving safely. (McVoy Supp. Decl. ¶14, authenticating Brink's Handbook's excerpt explaining this Messenger responsibility). Thus,

where the Messenger is responsible for ensuring that the Driver properly performs his safety functions, the Messenger plainly has duties that directly affect the vehicle's safe operation.

The Motor Carrier Act's regulations are plain that an employee can be a Driver's Helper even though safety-affecting activities are but a "minor part of his job." 29 CFR §782.4(b). Section 782.2(b)(3) further provides that whether a Driver's Helper is called upon to perform such activities "either regularly or from time to time," he comes within the exemption in "all workweeks when he is employed at such job." *See also Hernandez v. Brink's, Inc.*, 2009 WL 113406, *4 (S.D. Fla. 2009) ("Driver's helpers include armed guards on armored trucks because they directly affect the safety of operation of armored trucks in interstate or foreign commerce," including supervising the Driver's safety functions); *Baez v. Wells Fargo Armored Service Corp.*, 938 F.2d 180, 180 (11th Cir. 1991) ("driver guards, messenger guards and guards" on armored trucks were Driver's Helpers); *Jaramillo v. Garda, Inc.*, 2012 WL 4955932 (N.D. Ill. 2012) (plaintiffs did not even contest that Messengers are "Driver's Helpers" under the Motor Carrier Act).

The Messenger's safety-affecting activities are not occasional but daily. Messengers load the armored trucks daily prior to the start of their routes. (McVoy Decl. ¶10). Plaintiff Downes further admits that he continued to load the truck throughout the day with currency and coin deliveries and pickups. (*See* Response, p. 7) (Downes Decl. ¶3) (Plaintiffs' Rule 56.1 Counterstatement ¶2). Messengers further supervise the Driver throughout the entire run. (McVoy Supp. Decl. ¶14).

Thus, it cannot be reasonably disputed that Downes performed duties directly affecting the safety of the vehicles under the Motor Carrier Act. He is therefore subject to the Motor Carrier Act's exemption from overtime.

## <u>Conclusion</u>

Should the Court convert this motion to a motion for summary judgment (as Plaintiffs chose to do), summary judgment should be granted for Defendant, Brink's Incorporated, and against Plaintiffs, John Cantu and John Downes.  Brink's respectfully requests that the Court strike the class allegations and dismiss this lawsuit, in its entirety and with prejudice, and grant Defendant all other just and proper relief.

Respectfully submitted,

BRINK'S INCORPORATED

By:  /s/ Anne E. Larson
One of Its Attorneys

Anne E. Larson
Norma Manjarrez
OGLETREE, DEAKINS, NASH, SMOAK &
  STEWART, P.C.
155 N. Wacker Drive
Suite 4300
Chicago, IL  60606
312.558.1220

Dated:  March 21, 2016

11

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on March 21, 2016, the foregoing **Reply in Support of Motion to Strike Class Allegations, to Dismiss the Complaint or, in the Alternative, for Summary Judgment** was filed electronically with the Clerk of Court using the ECF system, which sent notification of such filing to the following:

Terrence Buehler
Touhy, Touhy, & Buehler, LLP
55 West Wacker Drive, Suite 1400
Chicago, Illinois 60601

Peter Lubin
Vincent DiTommaso
DiTommaso-Lubin, P.C.
The Oak Brook Terrace Atrium
17W2200 22d Street, Suite 200
Oak Brook Terrace, Illinois 60181


/s/ Anne E. Larson                              


24039508.2